**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Par-is Byrd, *et al.*,**

            **Plaintiffs,**

v.                                                                                  Case No. 3:07-cv-0323
                                                                                    Judge Thomas M. Rose

**Officer Timothy E. Gould, Officer Andrew Zecchini, City of Dayton Police Department and the City of Dayton,**

            **Defendants.**

---

**ENTRY AND ORDER GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGMENT, (DOC. 14), AND ENTRY OF TERMINATION.**

---

This matter is before the Court for decision on Defendants' Motion for Summary Judgment. Doc. 14. The case involves a claim that two Defendants, City of Dayton, Ohio Police Officers Timothy E. Gould and Andrew Zecchini, utilized unconstitutionally excessive force in detaining Plaintiff Par-is Byrd subsequent to a traffic stop. Because Plaintiff has no evidence that the force utilized by the officers was unconstitutionally unreasonable, and because immunity protects Defendants from Plaintiffs' state law claims, Defendants' motion to grant summary judgment on Plaintiffs' claims will be granted.

**I.     Background Facts**

Early on the evening of September 20, 2006 City of Dayton Police Officers Timothy Gould and Andrew Zecchini were in their marked police cruiser traveling south on Rosedale when they heard loud music coming from a vehicle that was approaching them. *Zecchini Depo*. at 17-18. The

driver was later determined to be Plaintiff Par-is Byrd. The two vehicles reached the intersection of Rosedale and Lexington approximately the same time. *Deposition of Andrew Zecchini*, doc. 15, at 17-18, 20 (hereinafter "*Zecchini Depo.*"). At that point Officers Zecchini and Gould determined they were going to initiate a traffic stop on Byrd's vehicle due to the noise violation, a minor misdemeanor, that they perceived. *Zecchini Depo*. at 19, 21.

At the intersection, Byrd made a right hand turn onto Lexington and the officers followed him – making a left hand turn onto Lexington. *Zecchini Depo*. at 19, 20-21. Once the officers turned onto Lexington, Byrd accelerated to a speed of more than 50 miles per hour. *Deposition of Timothy Gould*, doc. 16, at 28, 33-34 (hereinafter *"Gould Depo.")*; *Zecchini Depo*. at 30. Officer Gould accelerated to try to catch up to Byrd. *Zecchini Depo*. at 32; *Gould Depo*. at 30. Byrd then came to a stop sign at the intersection of Lexington and Euclid. *Gould Depo*. at 28, 33-34. Instead of stopping at the stop sign, Byrd only slowed down in order to successfully make the right turn onto Euclid. *Gould Depo*. at 28, 33-34. Officer Gould activated the police cruiser's overhead lights on Euclid. *Zecchini Depo*. at 23-24.

Byrd then ran another stop sign while turning left onto Grand. *Gould Depo*. at 28, 33-34. After running this second stop sign, Byrd pulled over around the 1300 block of West Grand. *Zecchini Depo*. at 33. Officers Gould and Zecchini exited their cruiser. *Gould Depo*. at 31. It is at this point that the officers' in-cabin recording camera begins to operate, after a ten to twenty second delay from turning on their overhead lights. *Gould Depo.* at 23, *Zecchini Depo*. at 25-28.

Byrd immediately opened his door and jumped out of his car. *Gould Depo*. at 34; *Zecchini Depo*. at 38. Almost simultaneously, Officers Gould and Zecchini were both exiting their police cruiser and shouting commands to Byrd, ordering him to get back in his car. *Gould Depo.* at 31.

Officer Gould gave two verbal commands and Officer Zecchini gave one. *Gould Depo*. at 31, *Zecchini Depo*. at 41. Officers Gould and Zecchini both testified that they believed that in exiting his car, Byrd was beginning an attempt to run on foot and elude them. *Gould Depo*. at 31; *Zecchini Depo*. at 39-40. Officer Gould stayed with the police cruiser while Officer Zecchini ran up to Byrd on foot. *Gould Depo*. at 32. Officer Zecchini reached Byrd at Byrd's car door within three seconds of the activation of the police cruiser recording. *Zecchini Depo*. at 39, 40 and Doc. 23, manually filed exhibit. When Officer Zecchini got near Byrd (about one foot away from him) he gave another verbal command for Byrd to get back in his car. *Zecchini Depo*. at 42. Byrd admits hearing these commands. *Byrd depo.*, doc. 17 at 36. Byrd responded, "Man, what's wrong with you?" *Id.* at 38.

Officer Zecchini reached Byrd and attempted to push him back into the car, but Byrd grabbed onto the door frame, resisted, and refused to get back into the car. *Zecchini Depo*. at 66, 72. Zecchini asserts that Byrd then shoved him. *Zecchini Depo*. at 66, 71. Byrd admits "I pushed his ass." *Byrd Depo.* at 43. Officer Zecchini then physically took down Byrd to the ground so he could handcuff him. *Zecchini Depo*. at 75-77. As Zecchini takes Byrd to the ground, they disappear from the view recorded by the in-cabin police video recorder.

At this point, Officer Gould saw Byrd bring his leg back like he was about to kick Officer Zecchini. *Gould Depo*. at 38, *Zecchini Depo*. at 77. At that point Officer Gould discharged his taser. *Gould Depo*. at 38. Officer Gould testifies that he discharged his taser because Par-is Byrd was resisting and about to kick Officer Zecchini; Byrd and Officer Zecchini were in the middle of a busy street; Officer Gould was concerned about traffic and concerned about people; and Officer Gould wanted to aid in ending the situation. *Gould Depo*. at 17. The effects of the taser caused Byrd to stop resisting. *Gould Depo*. at 16, *Zecchini Depo*. at 77. Byrd was then arrested.

A subsequent Dayton Police Department Internal Affairs investigation concluded that Zecchini acted unprofessionally in rapidly approaching Byrd. Doc. 23-3. The investigation concluded that Officer Zecchini's "actions escalated the threat level and created a situation that could have lead to physical harm to all parties. Officer Zecchini's conduct incited Byrd to become combative. Byrd resisted arrest and attempted to assault Officer Zecchini. Officer Gould was required to use force in order to control Byrd." *Id.* at 7.

On September 5, 2007, Plaintiffs filed an action in the United States District Court for the Southern District of Ohio, asserting violation of civil rights under 42 U.S.C. § 1983 by "us[ing] unreasonable and excessive force...in effectuating the arrest of Byrd...," assault and battery under Ohio law, intentional infliction of emotional distress to Byrd and his parents, and seeking punitive damages. Doc. 1.

Defendants have moved for summary judgment. Doc. 14. The Court is in receipt of responses and replies, rendering the matter ripe for judgment.

**II.     Analysis**

Defendants' motion for summary judgment asserts that the admissible evidence is susceptible of only the conclusion that a reasonable amount of force was used on Byrd, and that qualified immunity protects the defendants from suit under 1983; and that the state law claims asserted by Plaintiffs are subject to dismissal pursuant to the immunity afforded by Ohio Revised Code § 2744.

**A.     Standards of Review**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The analysis now turns to the merits of Defendants' motions for summary judgment.

**B.     Excessive Use of Force**

In *Saucier v. Katz*, 533 U.S. 194, 204-05 (2001), the Supreme Court reaffirmed that *Graham v. Connor*, 490 U.S. 386, 109 S.C. 1865, 104 L. Ed. 2d 443 (1989) reflects the proper approach to claims of use of excessive force during an arrest, an approach that presupposes that "the right to make an...investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S., at 396:

> In *Graham*, we held that claims of excessive force in the context of arrests or investigatory stops should be analyzed under the Fourth Amendment's "objective reasonableness standard," not under substantive due process principles. 490 U.S., at 388, 394. Because "police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation," *id.*, at 397, the reasonableness of the officer's belief as to the appropriate

> level of force should be judged from that on-scene perspective, *id.*, at 396. [*Graham*] set out a test that cautioned against the "20/20 vision of hindsight" in favor of deference to the judgment of reasonable officers on the scene. *Id.*, at 393, 396. *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim, "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*, at 396.

*Saucier v. Katz*, 533 U.S. 194, 204-05 (2001). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment." *Graham* at 396-97 (citation omitted).

Defendants assert that the officers' actions are objectively reasonable in light of the facts and circumstances that transpired. Plaintiffs counter that Zecchini "was criticized by his own department and was deemed unprofessional through an internal affairs investigation." Doc. 23 at 7. It appears clear that department policy would normally have had Zecchini pause at the left rear quarter panel of a vehicle from which the driver had exited. *Id.* It is a different question, though, whether it was *unreasonable* for Officer Zecchini to run up to the car of a man who had been observed driving between 50 miles per hour in a residential area, failing to stop for two stop signs and then exited his car when stopped by police.

It appears to the Court that it would have been ideal for Zecchini to have stopped at the rear left quarter panel of Byrd's car. This, however, is not an unconstitutional use of force. Had he done so, he might well have not attempted to physically attempt to compel Byrd to comply with the order to return to the car that Byrd admits having heard. It is this attempt to push Byrd into the car that must provide the basis for any constitutional violation.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment." *Id.* at 396-97 (citation omitted). The Court finds that the push in this case does not violate the Fourth Amendment. Though other avenues of conduct were more desirable, it was reasonable for Zecchini to believe that Byrd posed a flight risk and to attempt to gain his compliance with a lawful order. Once Byrd responded by pushing Zecchini, it was reasonable to determine that Byrd should be arrested with the use of force that could include a take down.

This was an unusual traffic stop. Officer Gould's senses were heightened. *Gould Depo*. at 28. When Officers Gould and Zecchini pulled behind Par-is Byrd, and instead of slowing down Byrd actually accelerated, which is unusual. *Gould Depo*. at 28. Then, Byrd failed to stop at a stop sign at Lexington and North Euclid, and again failed to stop for a stop sign at Grand. *Gould Depo*. at 28. When Par-is Byrd finally stopped, he leapt from his car.

Even when construing the facts in the light most favorable to Byrd, the Court is bound to conclude as a matter of law that the officers' decision to use force and the force utilized were not unreasonable. Therefore, Defendants' motion to grant summary judgment on the § 1983 excessive force claim will be granted.

**C.      Qualified Immunity**

Byrd further contends that the right to be free from the force he contends was unconstitutionally excessive was clearly established. However, the Supreme Court has held that officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984). The Sixth Circuit has applied this holding to conclude that "under § 1983, the issue is whether [the officer] violated the

Constitution, not whether he should be disciplined by the local police force." *Smith v. Freland*, 954 F.2d at 343, 347 (6th Cir. 1992).

In *Saucier*, the Supreme Court emphasized that it is not enough for a § 1983 unreasonable force plaintiff to prove a constitutional violation:

> *Graham v. Connor*…clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather,…"…the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: *The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right*." 483 U.S., at 640. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See *Wilson v. Layne*, 526 U.S. 603, 615 (1999) ("[A]s we explained in *Anderson*, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established").

*Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

Byrd points out that the Sixth Circuit has repeatedly held that "the right of the people who pose no safety risk to the police to be free from gratuitous violence during arrests" is clearly established. Doc. 23 at 9 (citing *Chreve v. Jassamine Cty., Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006). The cases in this line of authority which this Court has reviewed, however, involve the use of truly gratuitous force, cases in which the Plaintiff had already been restrained or controlled, yet officers continued to inflict force. See, e.g., *Lustig v. Mondeau*, No. 05-1905, 2006 WL 3253496 (6th Cir. Nov.8, 2006), *Harris v. City of Circleville*, 2008 WL 211363, *12 (S.D. Ohio, 2008) ("Even if Plaintiff was engaged in passive resistance, consciously refusing to obey Williams' order, the fact remains that he was already handcuffed and was under the firm control of three law

enforcement officers."); *Landis v. Baker*, 297 Fed. Appx. 453, 460-61 (6th Cir. 2008) (plaintiff was being held down in water while he was being tased). To the contrary, there are cases similar to the instant case that have found the use of a taser in effectuating an arrest not to be gratuitous. See, e.g., *Spears v. Cooper*, 2009 WL 838179, 10 -11 (E.D. Tenn. 2009)

Moreover, Officer Zecchini's testimony that he believed Byrd was attempting to flee, even if wrong, is relevant to the qualified immunity inquiry. "If an officer reasonably, but mistakenly, believed that one of factors relevant to the merits of the constitutional excessive force claim were present, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). In *Saucier* the Supreme Court noted that the qualified immunity inquiry has a dimension beyond whether the facts necessary to support a constitutional use of force were present:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001).

Thus, the instant case is similar to *Saucier* itself: "Though it is doubtful that the force used was excessive, we need not rest our conclusion on that determination. The question is what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards." *Saucier v. Katz*, 533 U.S. 194, 208 (2001). A reasonable officer in Zecchini's position could have believed that an unrestrained subject of an investigation who was

not complying with clear and legal orders could be forced into submission, and that this would be within the bounds of appropriate police responses. It is even more certain that a reasonable officer in the position of Officer Gould could reasonably believe that a subject of an investigation who was attempting to kick an investigating officer should be tased. For these reasons, the officers are further entitled to summary judgment on the basis of qualified immunity.

**D.     *Monell* liability**

In order to recover under § 1983 against the City of Dayton or the City of Dayton Police Department, Plaintiffs must establish that an official custom or policy caused the alleged constitutional deprivation. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Plaintiffs must also show that the official policy or custom was the "moving force" behind the alleged constitutional deprivation. See *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

Without evidence that the officers' acts were more than an isolated incidents of unconstitutional activity by a non-policymaking government official, Plaintiff cannot establish supervisor liability. See *Oklahoma City v. Tuttle*, 471 U.S. 808, 821-23 (1985) (absent evidence of prior existence of policy or custom of failing to investigate or discipline officers, single incident of unconstitutional activity by an officer is insufficient to impose municipal liability); *Hullett v. Smiedendorf*, 52 F. Supp. 2d 817, 828 (W.D. Mich. 1999) ("municipal liability for failing to investigate or discipline its officers cannot be derived from a single act by a non-policy-making municipal employee"); *Berry*, 25 F.3d at 1354 (plaintiff must show a "history of widespread abuse that has been ignored by the City" to establish liability under a "failure to discipline" theory).

Far from ignoring the problem, the Police Department investigated and issued personnel actions against Zecchini. That the City investigated and reprimanded Zecchini evinces an "acceptable follow-up program to communicate to [the City's] officers its constitutional policy on the use of…force." *Berry*, 25 F.3d at 1355. Since Plaintiffs have failed to present sufficient evidence from which a reasonable jury could infer that a custom or policy of the City caused the alleged constitutional deprivation, the Court will grant summary judgment to Defendants on Plaintiff's § 1983 claims against the City of Dayton and the City of Dayton Police Department.

E. **Plaintiff's state law claims are subject to dismissal pursuant to Ohio's Political Subdivision Immunity Statutes.**

While the foregoing analysis disposes of Plaintiffs' federal claims, the Court will exercise supplemental jurisdiction allowed by 28 U.S.C. § 1367. State law tort claims brought against political subdivisions are subject to provisions in Ohio Revised Code Chapter 2744. Under Ohio Rev. Code § 2744.02(A), political subdivisions are provided blanket immunity from liability for alleged tortious acts. While Plaintiffs have asserted an exception for acts or omissions performed with malicious purpose, Ohio Rev. Code § 2744.03, there is no evidence that malicious purpose motivated the officers' actions. "Employees of political subdivisions can be individually liable upon a showing of malice or wanton or reckless behavior." *Wilson v. Stark Cty. Dept. of Human Serv.*, 639 N.E.2d 105, 107 (Ohio 1994); Ohio Rev. Code § 2744.03(A)(6). While the issue of wanton misconduct is normally a jury question, the standard for showing wanton misconduct is high. *Fabrey v. McDonald Village Police Dept.*, 639 N.E.2d 31, 35 (Ohio 1994). "[W]anton misconduct [is] the failure to exercise any care whatsoever." *Id.* (citation omitted). Without evidence to meet these thresholds, Plaintiffs' claims must fail. Therefore, Plaintiffs' assault, loss of consortium, and intentional infliction of emotional distress claims will be dismissed.

### III. Conclusion

Because it is not unconstitutional for a police officer to seek to force a person under investigation for a traffic stop to comply with an order to return to their vehicle, and because a reasonable officer might reasonably, but mistakenly believe that the actions officers and Zecchini and Gould took were constitutional, summary judgment in favor of Officers Zecchini and Gould will be **GRANTED** on Byrd's unreasonable use of force claim. Because Byrd has no evidence that the Officers' actions were part of a pattern of an unconstitutional pattern or practice, the City of Dayton Police Department and the City of Dayton will be **GRANTED** summary judgment on Byrd's claims of supervisor liability. Finally, because Byrd's state law claims are subject to dismissal pursuant to Ohio's political subdivision immunity statutes, Defendants are **GRANTED** summary judgment on these claims as well. Thus, Defendants' Motion for Summary Judgment, doc. 14, is **GRANTED**. Wherefore, the captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, April 27, 2009.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE